**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**DANA AULT,**

     **Plaintiff,**

**v.**

**LESLIE A. SPEICHER, in her**
**individual capacity,**

     **Defendant.**                          **Case No. 07-cv-398-DRH**

**MEMORANDUM & ORDER**

**HERNDON, Chief Judge:**

## I.  INTRODUCTION

Pending before the Court is a Motion for Summary Judgment (Doc. 48), filed by defendant Leslie A. Speicher ("Speicher" or "Defendant"), a Motion for Summary Judgment (Doc. 56), filed by plaintiff Dana Ault ("Ault" or "Plaintiff"), as well as Defendant's Motion to Strike Plaintiff's Exhibits 8 and 12 and References to the Opinion of Professor Kennedy From Plaintiff's Motion for Summary Judgment (Doc. 62), and Defendant's Motion to Strike Plaintiff's Exhibit 1 and References to the Opinion of Professor Kennedy From Plaintiff's Response to Defendant's Motion for Summary Judgment (Doc. 65).  All four Motions have been fully briefed by the Parties and are now ripe for ruling.

Both of Defendant's Motions to Strike (Docs. 62 & 65) deal with

Plaintiff's expert witness, Professor Daniel B. Kennedy.  In both Motions, Defendant argues Professor Kennedy's opinion is not admissible evidence for several reasons and therefore, any direct references to his opinion, including any of Plaintiff's exhibits which reference or relate to his opinion, should be stricken from the record and not considered by the Court in deciding the pending summary judgment motions.

Plaintiff has filed suit against Defendant in her individual capacity. Plaintiff is a mother of four children.  Defendant is a caseworker for the Illinois Department of Children and Family Services ("DCFS").  Plaintiff's Amended Complaint (Doc. 20) states a cause of action against Defendant pursuant to **42 U.S.C. § 1983**, alleging a violation of her substantive due process rights to her "freedom of choice and privacy concerning the care, companionship, upbringing, and nurture of her four minor children," all in violation of the First, Ninth and Fourteenth Amendments of the United States Constitution (Doc. 20 - Amended Comp.).

For the reasons discussed herein, the Court finds good cause to strike Plaintiff's references to the opinion of Professor Kennedy from Plaintiff's summary judgment pleadings, as well as any related exhibits referencing the Professor's opinion (i.e., Exhibits 1, 8 and 12).  Further, the Court grants Defendant's Motion for Summary Judgment and therefore must deny Plaintiff's Motion for Summary Judgment.

## II.  BACKGROUND FACTS

Plaintiff is the mother of four children, S.Y., K.Y., C.M. and T.M., who are all minors.  Defendant is employed by Illinois DCFS as a Child Welfare Specialist, serving as a caseworker assigned to coordinate and provide services for families in need.  S.Y. and K.Y. are Plaintiff's children born during her first marriage and C.M. and T.M. are her children born during her second marriage.  At the time of the incident, Plaintiff had since divorced her second husband and was in a relationship with Eric Ogle ("Ogle").[1]

On September 1, 2004, the DCFS hotline received an anonymous report of suspected physical child abuse of Plaintiff's four-year old child, T.M.  At the time, Plaintiff and her four children were living with Ogle.  DCFS commenced an investigation regarding the suspected abuse.  Due to DCFS's involvement, Plaintiff chose to have all four children reside with her mother and step-father, Teresa and Tommy Samsil ("the Samsils"), rather than risk having her children placed into foster care.  On September 2, 2004, DCFS created a "safety plan," to which Plaintiff agreed.  Among other conditions, the safety plan included the arrangement for Plaintiff's children to continue residing with the Samsils.  The safety plan expired on September 16, 2004 (after the investigation was completed).

The investigator assigned to Plaintiff's case was Charlotte Gano.  During the investigation, the report of suspected child abuse was declared "unfounded" as

---

[1]  Since that time, Plaintiff has married Eric Ogle; her legal name is now "Dana Ogle."

to Plaintiff, however, Ogle was "indicated" by DCFS for physical child abuse of T.M. The case opened by DCFS regarding Plaintiff's family was an "intact family case," meaning that the family unit remained "intact" and that DCFS did not have any legal relationship with Plaintiff's children (such as having temporary custody or becoming the legal guardian, etc.). After the DCFS investigation was completed, because Ogle was indicated for physically abusing T.M. and because Plaintiff continued to maintain a relationship with Ogle, Defendant was assigned a caseworker for Plaintiff's family in September 2004. Plaintiff agreed to her family's participation in services offered by DCFS. Plaintiff's children continued to reside with their grandparents, the Samsils.

Defendant met with both Plaintiff and Ogle to develop the first service plan. This first service plan was initiated on October 21, 2004, and was to be reviewed on March 31, 2005 (Doc. 49-3, Def.'s Ex. 5 - 1st service plan). Plaintiff and Ogle voluntarily signed the first service plan. The first service plan included the following provisions: (1) Plaintiff's children would continue to reside with the Samsils at least through the 2004-2005 school year to assure their stability and prevent another school transfer; (2) Plaintiff's children would continue to reside with the Samsils at least until such time that all counselors involved agreed that it would not be detrimental to the children's safety for the family to reunite; (3) that Plaintiff and Ogle attend counseling and parenting classes; (4) that Ogle attend substance abuse counseling; (5) that Ogle's contact with Plaintiff's children be supervised; and (6) that Plaintiff's two oldest children, S.Y. and K.Y. attend counseling (*Id*).

The first service plan included information regarding the service appeal process. In other words, if Plaintiff did not agree with any of the provisions of the service plan, she had the right to appeal it by writing down her disagreement(s) and sending it to Defendant's supervisor. The basic idea behind the service plan was for Defendant to determine whether Plaintiff, Ogle and the children had all substantially complied with the plan's provisions in order to show that services were no longer necessary and DCFS could discontinue its involvement with Plaintiff's family.

In December 2004, criminal charges of domestic battery were filed against Ogle in the Circuit Court of Clark County, Illinois, based on the same allegations of injuries to T.M. which gave rise to the DCFS investigation of Plaintiff's family back in September 2004. In March 2005, the circuit court entered a no-contact order pursuant to these charges, under which Ogle was not to have any contact with Plaintiff's four children. The circuit court dismissed the domestic battery charge against Ogle in May 2005. Thereafter, the State filed a misdemeanor battery charge against Ogle in May 2005, based on the same allegations. In August 2005, the misdemeanor charges against Ogle were dismissed upon the State's motion. Accordingly, the no-contact order entered against him expired upon the dismissal of the charges.

Largely due to the pending criminal charges, the no-contact order entered against Ogle and because Plaintiff continued to maintain her relationship with him, upon the six-month review of the service plan on March 18, 2005, a second service plan was developed containing identical provisions to the first service plan

(Doc. 49-5, Def.'s Ex. 8 - second service plan). Both Plaintiff and Ogle signed the second service plan on April 22, 2005 (*see* Doc. 49-6, Def.'s Ex. 9 - signature page). Upon the six-month review of the second service plan, Defendant created a third service plan on September 21, 2005, which also included the additional provision that Plaintiff attend substance abuse counseling. However, upon advice of counsel, Plaintiff refused to sign the third service plan.

Concurrently, on September 18, 2005, the Clark County State's Attorney filed a Petition for Adjudication of Wardship regarding Plaintiff's children (Doc. 49-4, Def.'s Ex. 6 - Petition). An Amended Petition was then filed on September 22, 2005, alleging that Plaintiff was homeless and unwilling to provide the necessary care and supervision for her four children, that she failed to take appropriate action to protect T.M. after the child was a victim of physical abuse (Doc. 49-4, Def.'s Ex. 7 - Amended Petition). On May 5, 2005, the Court found that the State had failed to prove neglect as to Plaintiff and thus denied the Petition for Adjudication of Wardship. After the wardship proceeding was dismissed, Plaintiff picked up her children, but her eldest, S.Y., chose to remain residing with the Samsils. Plaintiff's three youngest children currently reside with her and Ogle.

## III. <u>DISCUSSION</u>

**A.     Defendant's Motions to Strike**

Defendant has filed two Motions to Strike (Docs. 62 & 65), both dealing with Plaintiff's expert witness, Professor Daniel B. Kennedy ("Kennedy").  Kennedy is a law professor at the University of Illinois School of Law.  He is also a licensed attorney who has litigated a number of juvenile abuse and neglect cases.  Plaintiff offers Kennedy's opinion due to his knowledge and experience with the various Illinois laws and regulations governing DCFS workers (Doc. 69).  Specifically, Defendant moves to strike any references made by Plaintiff to Kennedy's opinion in her Motion for Summary Judgment (Docs. 56), her Response to Defendant's Motion for Summary Judgment  (Doc. 61), as well as Plaintiff's Exhibits 1, 8 and 12, which reference his opinion.  Defendant moves pursuant to **FEDERAL RULES OF CIVIL PROCEDURE 37 and 56**, as well as **FEDERAL RULES OF EVIDENCE 702, 801(c) and 802**.  The Court will deal with each of Defendant's arguments, in turn.

**1.     The Admissibility of Kennedy's Expert Opinion Under Rule 702**

**FEDERAL RULE OF CIVIL PROCEDURE 56**, which governs summary judgment motions, allows the deciding Court to only consider evidence that would be admissible at trial.  ***Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003 ) (citation omitted)**.  Defendant argues that Kennedy's expert opinion would not be admissible under **FEDERAL RULE OF EVIDENCE 702** and therefore should not be considered by this Court when ruling on the Parties' respective summary judgment

motions.  **Rule 702** provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

Defendant first argues that Kennedy's opinion does not meet the requirements of **Rule 702** because it does not address any of the facts in this case. Rather, Defendant construes the opinion as merely an application of Illinois state law to the facts of the case, to arrive at the conclusion that Defendant violated Plaintiff's constitutional rights (Doc. 63, p. 3).  Believing this to be a legal conclusion that only the Court may determine at the summary judgment stage, Defendant believes that Kennedy's opinion amounts to merely a "legal opinion," which thereby "invades the province and authority of the Court . . ." (*Id.*).  In response, Plaintiff argues that Kennedy's opinion is admissible, believing that under Seventh Circuit law, he should be able to offer his expert opinion, given his family law background, regarding whether Defendant's actions were unauthorized by the various Illinois laws and regulations governing DCFS workers (Doc. 69, pp. 3-4).  Rather than stating a legal conclusion, Plaintiff argues that Kennedy's opinion merely identifies the applicable law to make it easier for the Court in analyzing the Parties' arguments, but the Court does not have to consider Kennedy's ultimate opinion.

Generally speaking, opinions offering legal conclusions are not admissible, especially when those opinions provide the outcome of a case. ***See Good Shepard Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *United States v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir. 1996))**. Plaintiff cites two Seventh Circuit cases which she believes provides authority to find Kennedy's opinion admissible (Doc. 69, p. 3, citing ***United States v. Davis*, 471 F.3d 783 (7th Cir. 2006); *United States v. Chube II*, 538 F.3d 693 (7th Cir. 2008)**). In ***Davis***, the Seventh Circuit upheld the district court's admission of expert testimony from a Medicaid employee regarding reimbursement for mental health services. The Seventh Circuit stated that "[e]xperts are permitted to testify regarding how their government agency applies rules as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case." ***Davis*, 471 F.3d at 789 (experts may testify as to how they enforce agency regulations and whether certain transactions comply wit agency regulations)**. In ***Chube II***, the Seventh Circuit again upheld the district court's admission of expert testimony from two doctors regarding (1) that there was no legitimate medical purpose for the prescriptions in question; and (2) determining whether the defendants acted within the medical "standard of care" is a distinct issue from determining "legality." ***Chube II*, 538 F.3d at 698-699**. Ultimately, the Seventh Circuit found the doctors' opinions did not constitute legal conclusions on the question of the defendants' intent. ***Id.***

The Court finds these two cases distinguishable from the instant matter. Here, rather than being an agency employee, as in **Davis**, Kennedy is a practicing attorney. While he may be considered an expert on family law, including DCFS regulations, it is not the same as if he were a DCFS employee testifying about how DCFS enforces its regulations. The Court views his expert opinion as nothing more than a cleverly disguised legal argument and analysis. While the Court appreciates Plaintiff's effort to narrow down the universe of applicable Illinois laws and regulations the Court should consider when determining these dispositive motions, introducing such an "aid" through expert testimony is not the proper means to do so. A mere legal argument made within Plaintiff's summary judgment motion would have likely accomplished the same thing as what Kennedy's opinion sets out to do. Nor is the instant matter similar to **Chube II**. In **Chube II**, the expert opinion testimony did not testify as to an ultimate legal conclusion necessary for the jury to find the defendants' guilty or innocent. The Government's burden of proof required the jury to find that the defendants also acted with the requisite intent, something which was *not* part of the doctors' opinion testimony. Therefore, the testimony was deemed admissible.

Here, although Kennedy's opinion does not specifically offer the an ultimate legal conclusion that Defendant's unlawful actions infringed upon Plaintiff's substantive due process rights, he again, is merely stating the applicable law and whether or not Defendant abided by it. There is no way for the Court to construe this as anything but the Court's job in deciding these Motions and therefore, whether

or not it goes to the ultimate legal conclusion the Court must make, it is outside of the realm for which expert testimony is allowed. Accordingly, the Court finds Kennedy's opinion constitutes an inadmissible legal conclusion under **Rule 702**.

## 2. Defendant's Other Arguments Regarding Admissibility

As the Court has already found Kennedy's opinion to be inadmissible under **Rule 702**, it need not consider Defendant's further argument that Kennedy's opinion, as embodied in his report attached as Plaintiff's Exhibit 8, constitutes inadmissible hearsay under **FEDERAL RULES OF EVIDENCE 801(c)** and **802**. (In the event the Court finds Kennedy's opinion inadmissible under either **Rule 702, 801(c)** or **802**, Defendant also request that the Court strike Kennedy's curriculum vitae, attached as Plaintiff's Exhibit 12, as it will not be relative to any question the Court need decide at the summary judgment stage.) Nor does the Court need to consider Defendant's argument that Kennedy's Affidavit, attached as Plaintiff's Exhibit 1 to her Response to Defendant's Motion for Summary Judgment, should be stricken for failure to comply with the requirements of **FEDERAL RULE OF CIVIL PROCEDURE 56(e)**. Lastly, the Court also does not need to consider Defendant's argument that Kennedy's Affidavit should be stricken pursuant to **FEDERAL RULE OF CIVIL PROCEDURE 37(c)(1)**, for failing to supplement Plaintiff's **Rule 26(a)(2)(B)** expert report disclosure.

In other words, because the Court has already found Kennedy's opinion to be inadmissible for the purposes of deciding the Parties' respective summary

judgment motions, it will also not consider any reference thereto or exhibits which contain this information, such as Plaintiff's Exhibits 1, 8 and 12.[2]  Accordingly, Defendant's Motions to Strike (Docs. 62 & 65) are **GRANTED**.

**B.      The Parties' Summary Judgment Motions**

Defendant believes she is entitled to summary judgment, asserting that the facts show she did not violate Plaintiff's constitutional rights to "freedom of choice and privacy concerning the care, companionship, upbringing, and nurture of her four minor children" (Doc. 48, p. 1).  In the alternative, Defendant believes that even if the Court finds that Defendant's alleged conduct violated Plaintiff's rights, Defendant is entitled to qualified immunity.  Conversely, Plaintiff's cross summary judgment motion asserts that the facts establish Defendant's actions violated her constitutional right to familial integrity (or right not to be forcibly separated), including her right to parent her own children, going beyond the protective shield of the qualified immunity doctrine.  Because the Parties' Motions relate to the same overarching issues, the Court will address them concurrently.

**1.      Legal Standard**

Summary judgment is proper where the pleadings and affidavits, if any, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Oats v. Discovery Zone*, **116 F.3d 1161, 1165 (7th Cir. 1997) (citing** *Celotex Corp. v. Catrett*, **477**

---

[2]  This does not imply, however, that the Court will not conduct its own research of the applicable Illinois laws and regulations governing DCFS.

**U.S. 317, 322 (1986))**. The movant bears the burden of establishing the absence of fact issues and entitlement to judgment as a matter of law. ***Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323)**. In reviewing a summary judgment motion, this Court does not determine the truth of asserted matters, but rather decides whether there is a genuine factual issue for trial. ***Celex Group, Inc. v. Executive Gallery, Inc.*, 877 F. Supp. 1114, 1124 (N.D. Ill. 1995)**. This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the nonmovant. ***Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))**.

In response to a motion for summary judgment, the nonmovant may not simply rest on the allegations in the pleadings; rather, it must be shown through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. ***Walker v. Shansky*, 28 F.3d 666, 670-71 (7th Cir. 1994)**, *aff'd*, **51 F.3d 276 (citing *Celotex*, 477 U.S. at 324)**. No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." ***Anderson*, 477 U.S. at 249-50 (citations omitted);** *accord **Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994)**.

2.    **Analysis**

   a.    **Whether Defendant's Actions Violated Plaintiff's Substantial Due Process Right to Familial Integrity**

Plaintiff alleges that Defendant, as the assigned DCFS caseworker, infringed upon her substantive due process rights to familial integrity; specifically, the care, companionship, upbringing and nurture of Plaintiff's four minor children. Specifically, Plaintiff complains that the service plans, drafted by Defendant, which required Plaintiff's four minor children to remain with her mother and step-father (the Samsils) indefinitely, constituted an unlawful infringement on Plaintiff's right to familial integrity.  Additionally, Plaintiff argues that from June 2005 through April 2006, Defendant further unlawfully infringed upon this right when she told Plaintiff's mother that she was not to allow Plaintiff to visit any of her four children unsupervised.  In other words, Plaintiff construes Defendant's actions as a "de facto" taking into protective custody of her four children.  Plaintiff also contends Defendant threatened that if Plaintiff did not comply with the terms of the service plans, she or DCFS would have her children taken into foster care.  Plaintiff claims Defendant never explained to her that she did not have the power to just "take" the children, but instead, she could only recommend that a petition for adjudication of guardianship be filed with the court.  Therefore, Plaintiff believes Defendant's unauthorized threats essentially coerced her into complying with the terms of the service agreements.

Conversely, Defendant argues that her actions did not infringe upon Plaintiff's constitutional rights to familial integrity or familial relations.  Defendant

also believes that the balancing factors regarding Plaintiff's right to preserve her familial integrity versus the government's interest in protecting children weigh in Defendant's favor. Further, Defendant asserts that even if her actions are deemed infringing, the doctrine of qualified immunity applies to shield her from individual liability in this suit as it was not previously established that the complained-of conduct violated Plaintiff's constitutional rights.

The "right to conceive and to raise one's children" is recognized as one of the "basic civil rights of man." **Stanley v. Illinois, 405 U.S. 645, 652 (1972) (internal quotes and citations omitted)**. Familial integrity is protected under the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment and the Ninth Amendment. **Id. (citations omitted)**. Children, likewise, have an equally substantive due process right to be raised and nurtured by their parents. **Berman v. Young, 291 F.3d 976, 983 (7th Cir. 2002) (citing Troxel v. Granville, 530 U.S. 57, 65-66 (2000); Brokaw v. Mercer County, 235 F.3d 1000, 1018-19 (7th Cir. 2000))**.

The right to maintain familial integrity with one's children is not absolute, but is instead "limited by the compelling governmental interest in the protection of children." **Doe v. Heck, 327 F.3d 492, 520 (7th Cir. 2003) (citing Brokaw, 235 F.3d at 1019)**. The government may only intervene, however, "when it has 'some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.'" **Berman, 291**

**F.3d at 983-84 (citing _Brokaw_, 235 F.3d at 1019; _Croft v. Westmoreland County Children and Youth Servs._, 103 F.3d 1123, 1126 (3d Cir. 1997)).**

Because the fundamental right to preserve the family unit must be balanced against the government's right in protecting children from abuse, courts weigh these competing interests under the same reasonableness test used to evaluate Fourth Amendment claims, whereby a court should consider:

> (1) the nature of the privacy interest upon which the action taken by the State intrudes;
> (2) the character of the intrusion that is complained of;
> (3) the nature and immediacy of the governmental concern at issue;
> (4) the efficacy of the means employed by the government for meeting this concern.

**_Doe_, 327 F.3d at 520 (citing _Vernonia v. Sch. Dist. 47J v. Acton_, 515 U.S. 646, 654-60; _Joy v. Penn-Harris-Madison Sch. Corp._, 212 F.3d 1052, 1058-59 (7th Cir. 2000)).**

This balancing test serves as a means to avoid arbitrary investigation of families by child welfare caseworkers. **_See id._**

Using the **_Doe_** balancing test to analyze Plaintiff's substantive due process rights to familial integrity claim, the Court first looks at the nature of the privacy interest upon which DCFS has allegedly intruded. As discussed previously herein, the right to parent and to keep one's family intact is a fundamental constitutional right, as well as fundamental to the foundations of our civilization. **_Doe_, 327 at 517-18**. Therefore, Plaintiff's privacy interest was of the utmost importance.

Next, the Court must examine the character of the intrusion which

Plaintiff complains.  From the facts, it is shown that Defendant first became involved with Plaintiff and her family when she was assigned as the DCFS caseworker, in order to formulate a service plan, after the DCFS investigation and safety plan had terminated, as Plaintiff had agreed to her family's participation in services offered through DCFS.  The facts also show that Plaintiff had voluntarily taken her four minor children to live with their grandparents, the Samsils, during the pendency of the DCFS investigation.  Plaintiff's children remained with the Samsils throughout the DCFS investigation and this living arrangement was incorporated as part of the safety plan.  Apparently, this living arrangement was also incorporated as part of the several service plans, developed by Defendant.  Not only did the service plans require Plaintiff's children to remain living with the Samsils for the remaining school year, the service plans also required Plaintiff's children to remain living with the Samsils until such time that all of the assigned counselors agreed it would not be detrimental for the children to return to living with Plaintiff.  Although Plaintiff ultimately agreed to the first two service plans (she declined to sign the third upon advice of counsel), she argues that Defendant had no legal basis to require this "living arrangement."  She also believes Defendant further overstepped her authority when she urged Plaintiff's mother not to allow Plaintiff to visit her children unsupervised.  If Plaintiff is correct in her beliefs, the Court views Defendant's intrusion as severe.

Third, the Court looks to the nature and immediacy of the governmental concern at issue.  In this case, the initial DCFS investigation determined that the allegations of physical child abuse as to Plaintiff's child, T.M., were unfounded as to

Plaintiff.  However, Plaintiff's then-boyfriend, Eric Ogle, was indicated and charges were filed against him in state court.  Later, a no-contact order was entered by the Court requiring that Ogle not have contact with Plaintiff's children.  Therefore, during the time period of the first service plan and for a large portion of the second service plan, Ogle was regarded as being a potential danger to the children.[3]  Because Defendant had reason to believe Plaintiff either continued to reside with Ogle or at the least, intended on maintaining an intimate relationship with him in the future, Defendant believed that allowing Plaintiff's children to return home would not be in their best interests.  Additionally, Defendant had further concerns regarding Plaintiff's living arrangements.  At one point, Plaintiff had moved out of her home and was "camping out" on land while renovating a trailer she planned to later reside in.  Because of the impractical living conditions (such as no working utilities), Defendant again felt allowing Plaintiff's children to return to Plaintiff would go against their best interests, even if Plaintiff claimed she was no longer seeing or living with Ogle (Doc. 48, Ex. 1 - Speicher Affidavit, ¶¶ 38-51).  Plaintiff also was not attending all of her counseling sessions, required as part of the service plan.  Thus, to the Court, it appears that Defendant's concerns, whether or not they were valid, were of great immediacy at the time.

Lastly, the Court must analyze the efficacy of the means employed by

---

[3]  As previously set forth, the charges pending against Ogle were eventually dismissed in late August 2005 and the no contact order also expired.  However, the third service plan still required Ogle to have only supervised visits with Plaintiff's children to be supervised, listing a pending state charges for a drug/alcohol related vehicular accident (Doc. 48, Ex. 11).

DCFS, via Defendant, to safeguard Plaintiff's children, by requiring that they remain residing with the Samsils until DCFS was satisfied that their return to Plaintiff would be in their best interests. The right for DCFS to develop services plans is codified in **325 ILL. COMP. STAT. 5/8.2**. It reads, in pertinent part:

> If the Child Protective Service Unit determines, following an investigation made pursuant to Section 7.4 of this Act, that there is credible evidence that the child is abused or neglected, the Department shall assess the family's need for services, and, as necessary, develop, with the family, an appropriate service plan for the family's voluntary acceptance or refusal. . . . The Department shall comply with Section 8.1 by explaining its lack of legal authority to compel the acceptance of services and may explain its concomitant authority to petition the Circuit court under the Juvenile Court Act of 1987 or refer the case to the local law enforcement authority or State's attorney for criminal prosecution.

> For purposes of this Act, the term "family preservation services" refers to all services to help families, including adoptive and extended families. *Family preservation services shall be offered, where safe and appropriate, to prevent the placement of children in substitute care* when the children can be cared for at home or in the custody of the person responsible for the children's welfare without endangering the children's health or safety, *to reunite them with their families if so placed* when reunification is an appropriate goal, or to maintain an adoptive placement.

**325 ILL. COMP. STAT. 5/8.2 (emphasis added)**.

Service plans, according to the statute, provide for services so that the family may work towards being reunited in situations where the children have been "placed." From a further review of the relevant statutes and regulations governing DCFS, the Court finds that the "placement" of children must occur by one of several specified means. The Illinois Administrative Code does not allow DCFS to "place" children unless it has the appropriate legal authority to do so, which stems from

either:

  a) temporary protective custody in accordance with the Abused and Neglected Child Reporting Act [**325 ILL. COMP. STAT. 5**];[4]

  b) adoptive surrender or consent to adoption by a specified person in accordance with the Adoption Act [**750 ILL. COMP. STAT. 50**];

  c) custody or guardianship in accordance with the Juvenile Court Act of 1987 [**705 ILL. COMP. STAT. 405**]; or

  d) temporary custody with written consent of the parents . . . [a] written consent from a parent . . . requesting temporary placement services for their children is known as a ***voluntary placement agreement***. ***A voluntary placement agreement may be entered into for a maximum of 60 days*** when it is in the best interests of the children. A voluntary placement agreement requires prior written approval of the administrator in charge of the Department region or designee. A voluntary placement agreement may be renewed for an additional 60 days only with the prior non-delegable written approval of the administrator in charge of the Department region.

**89 ILL. ADMIN. CODE 301.40 (emphasis added)**.

  Similarly, the phrase "Children for Whom [DCFS] is Legally Responsible" is defined within the Illinois Administrative Code to mean "children for whom the Department has temporary protective custody, custody or guardianship

---

[4]  Under Illinois law, DCFS:

  may take or retain temporary protective custody of the child without the consent of the person responsible for the child's welfare, if (1) [it] has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 for temporary custody of the child. The person taking or retaining a child in temporary protective custody shall immediately make every reasonable effort to notify the person responsible for the child's welfare and shall immediately notify [DCFS].

**325 ILL. COMP. STAT. 5/5**.  ***See also*** **89 ILL. ADMIN. CODE tit. 89, § 300.120**, which further specifies the procedure for taking children into protective custody.

via court order, or children whose parents signed an adoptive surrender or voluntary placement agreement with the Department." **ILL. ADMIN. CODE tit. 89, § 301.20**. Additionally, "Voluntary Placement Agreement" is defined as "a time-limited written request and consent from a parent, guardian or legal custodian of a child for placement of the child out of the home. When signed by designated [DCFS] staff, the Department agrees to provide child welfare services which include placement." **89 ILL. ADMIN. CODE tit. 89, § 301.20**. While under **20 ILL. COMP. STAT. 505/7(b)**, Illinois law does allow DCFS to consider a relative when determining where the child should reside, this is only when DCFS is "placing" the child, and to do so, of course, DCFS must have the legal authority to place, as outlined in **ILL. ADMIN. CODE tit. 89, § 301.20**.

In this case, according to the applicable statutes and regulations Plaintiff's children were never "placed" by DCFS. At most, the were voluntarily "placed" with the Samsils by Plaintiff herself. However, the facts do not indicate that Plaintiff ever entered into a Voluntary Placement Agreement with DCFS for this arrangement. Therefore, the Court finds that technically, Defendant had no legal authority as a DCFS caseworker to require Plaintiff's children to reside or remain residing with the Samsils as a condition of the service plans, because the children were not actually "placed" by DCFS prior to the development of any of the service plans. Nor does it appear that Defendant maintained legal authority to subsequently require Plaintiff be allowed only supervised visitation with her children. In her

briefing, Defendant does little to prove otherwise.

Yet, the facts also reveal that Plaintiff voluntarily agreed to this living arrangement, despite it not being her ultimate preference (*see* Doc. 57, Plf's Ex. 1 - Ault Dep., 39:8-42:16). Although it remains disputed whether Defendant clearly and verbally informed Plaintiff that her agreement to the service plans was voluntary, that DCFS had no legal custody over Plaintiff's children, and that Plaintiff could appeal any part of the service plan she did not agree with, the signature page of the service plan itself (*see e.g.*, Doc. 49, Ex. 9) and a September 15, 2004 letter Plaintiff received from Defendant (Doc. 49, Ex. 4, p. 1) both outlined Plaintiff's appeal rights. Plaintiff's own testimony also indicates she was aware that if she did not agree to sign the service plans, it would most likely result in Defendant asking the State's Attorney to file a petition for adjudication of wardship, where Plaintiff's objections to the children's living arrangements could thereafter be argued in a court of law (*see* Doc. 57, Plf's Ex. 1 - Ault Dep., 36:10-38:5; 55:11-56:18; 58:11-21; 125:6-127:6). Even when Plaintiff claims Defendant "directed" Plaintiff's mother not to allow Plaintiff to be with her children without supervision, Plaintiff did not file a service appeal or otherwise dispute it.

The Court finds that unlike the position Defendant advocates in her briefing, her means for protecting the best interests of Plaintiff's children were not efficient or tailored to meet her concerns. The service plan requirement that Plaintiff's children remain living with the Samsils until such time as others saw it fit to allow them to return to living with Plaintiff was by no means "efficient" or "well

tailored" if Defendant had no legal authority to demand such arrangements. Under Illinois law, to do so would require Plaintiff's children to have been "placed" by DCFS, which the Court finds they were not. Perhaps because the children were residing with the Samsils by Plaintiff's own arrangement, prior to the inception of the first service plan, provided Defendant with the means to continue protecting their best interests while avoiding the technical requirements of "placement." Yet, Illinois statutes and administrative code are not merely suggestions; they are promulgated in order to provide a uniform method by which agency personnel can lawfully perform their employment duties. Therefore, by failing to follow Illinois law, Defendant's actions can hardly be characterized as an "efficient" means of protecting Plaintiff's children. While it also remains disputed as to whether Defendant actually demanded Plaintiff's mother to not allow Plaintiff unsupervised visits with her children or whether Defendant merely "recommended" it, such behavior, if true, would amount to an overreaching of authority Defendant clearly did not possess under any statute or other regulation so far uncovered by the Court. This too, would prove an extremely "inefficient" and poorly tailored means to protect the interests of Plaintiff's children.

Further, while Plaintiff's "consent" to the service plan was, indeed, voluntary in nature and she maintained a right to appeal, the Court recognizes that at the time of the first two service plans, Plaintiff remained unrepresented by counsel and did not likely possess the legal knowledge to determine whether Defendant had proper authority to require Plaintiff's children to remain residing with the Samsils

as a condition of the service plans. In Plaintiff's mind, she either agreed to the terms of the service plans in full or risked going to court to adjudicate wardship. Here, the Court sympathizes with Plaintiff and other parents who have been in similar situations: although she may believe she is a fit parent and should have every right to have her children reside with her, going to court presents a huge risk with dire consequences should Plaintiff not prevail. This is not an easy decision to make as a parent. In fact, it is clear to see why Plaintiff, as well as many others in her situation, choose to comply with the service plan rather than challenge it and risk losing their children. Even armed with the legal knowledge the Court has gleaned from Illinois law does not make one wish to rush into a custody battle with the State, in court (especially considering many parents in this situation do not have the financial means to afford legal counsel). Plaintiff was in a very delicate and vulnerable situation – one that should not have been further exacerbated by Defendant's actions. Therefore, the Court admonishes DCFS personnel to carefully heed the law and follow proper protocol when interfering with someone's right to parent their children. By stating this, the Court does not wish to make light of how tough of a job working for DCFS can be or how important it is to act in a way that protects the safety of children. Yet, the rights of the parents must not be railroaded or otherwise ignored. Again, a proper balance between these competing interests, as discussed in ***Doe***, must be maintained.

  While the Court finds that Defendant's means of protecting the interests of Plaintiff's children strayed beyond the scope allowed by Illinois law, it is

nevertheless bound by precedent to hold that Defendant's actions did not infringe upon Plaintiff's substantive due process right to familial integrity. The Seventh Circuit examined the legitimacy of DCFS "safety plans" in the case of **_Dupuy v. Samuels_, 465 F.3d 757 (7th Cir. 2006)**. In **_Dupuy_**, the Seventh Circuit recognized that because "the decision to agree to a safety plan is optional," a safety plan "imposes no obligation on anybody." **_Id._ at 761**. The appellate court further noted a parent's right to a prompt judicial hearing if they did not agree to the plan. Thus, a safety plan was viewed by the Seventh Circuit as "a form of interim settlement agreement pending the outcome of the [DCFS] investigation . . . ." **_Id._** Although the Seventh Circuit recognized a parent's plight if they refused to accept the terms of the safety plan and instead opted for a judicial hearing which could result in a removal of the children, it was "a dilemma implicit in any settlement process. If there weren't a downside to refusing to settle, there would be no settlements." **_Id._**

**_Dupuy_** additionally did not find that DCFS "coerced" a parent into agreeing with a safety plan for fear of losing their children in a court hearing, as coercion was not forbidden when DCFS was merely threatening to enforce its legal rights. **_Id._ at 762 ("Coercion is objectionable - and when objectionable is more aptly described as duress or extortion - when illegal means are used to obtain a benefit.")**. The Seventh Circuit did not see how a parent's option to reject the safety plan and go to court for a hearing made them worse off. **_Id._** Ultimately, it found that DCFS's option of developing a safety plan was "a sensible, perhaps indeed

an unavoidable, partial solution to the agonizingly difficult problem of balancing the right of parents to the custody and control of their children with the children's right to be protected against abuse and neglect." **Id. at 763 (distinguishing *Doe*, 327 F.3d at 524-25, where threatening the parents with the loss of their children was one DCFS had no right to make, given it did not suspect the parents of child abuse and therefore had no adequate grounds or proper legal authority to remove the child from the parents' custody even temporarily)**.

Here, although Defendant did not have the legal grounds to require that Plaintiff's children remain with the Samsils as a condition of the service plans, she did have the authority pursuant to **325 Ill. Comp. Stat. 5/8.2** to "threaten" Plaintiff that she would recommend to the State's Attorney that a petition for adjudication of wardship be filed. Plaintiff also knew that her consent to the service plans was voluntary and that she had the right to a service appeal. Therefore, in accordance with ***Dupuy***, Plaintiff was not coerced into signing or abiding by the service plans. Similarly, the Seventh Circuit, in ***Terry v. Richardson*, 346 F.3d 781 (7th Cir. 2003)**, found that a DCFS investigator did not interfere with plaintiff's substantive due process right to the care and custody of his child with the requirements of the safety plan. **Id. at 784-85**. Instead, the appellate court believed that any reasonable person would not have left the defendant's authority unquestioned and should have challenged, in court, the defendant's lack of authority to require that he remain separated from his daughter. **Id. at 785-87 (especially noting the fact that the**

**plaintiff was represented by legal counsel**). *Terry* is analogous to this case in that Plaintiff also could have challenged Defendant's authority, or lack thereof, to require that Plaintiff's children remain residing with the Samsils. This holds especially true after the point in time at which Plaintiff was represented by legal counsel.

In sum, although the Court finds Defendant did not possess proper legal authority under Illinois law to require Plaintiff's children to remain living with the Samsils as a condition of the service plans, because Plaintiff had the option of not agreeing with the service plan and challenging Defendant's authority in court, and because Defendant had the legal right to threaten Plaintiff's failure to agree with the possibility of court proceedings, Seventh Circuit precedent will not find Defendant's actions to have infringed on Plaintiff's right to familial integrity. However, even if the Court found Defendant's actions to be unconstitutional, the doctrine of qualified immunity would apply to shield her from liability.

### b.    Whether Qualified Immunity Applies to Defendant's Actions

The doctrine of qualified immunity shields public officials from individual liability in § 1983 lawsuits for their actions taken while performing discretionary functions. *Brokaw*, **235 F.3d at 1022 (citing** *Harlow v. Fitzgerald*, **457 U.S. 800, 818 (1982))**. Although the doctrine can render a public official immune from a civil rights suit even if the official has violated a plaintiff's constitutional rights, qualified immunity will not protect public officials when "their conduct violates clearly established statutory or constitutional rights of which a

reasonable person would have known." ***Id.; see also Darryl H. v. Coler*, 801 F.2d 893, 907 (7th Cir. 1986)**.

In other words, "in the light of pre-existing law the unlawfulness [of the official's conduct] must be apparent." ***Doe*, 327 F.3d at 515 (citation omitted)**. Therefore, it is not always necessary that a plaintiff identify a case on point with the facts and issues of her case if she can show that the public official's conduct violated a constitutional right that "was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." ***Brokaw*, 235 F.3d at 1022 ("[B]inding precedent is not necessary to clearly establish a right.") (citation omitted)**. However, clearly, when analyzing whether qualified immunity applies to shield a defendant from liability, a court must first determine whether a constitutional violation has occurred. If so, the court must next "consider whether the constitutional right at issue was clearly established at the time of the violation," either by legal precedent or by objective obviousness. ***Berman*, 291 F.3d at 983**.

Even if it were found that Defendant's actions violated Plaintiff's constitutional right to familial integrity, legal precedent did not clearly address the application of Illinois law regarding a DCFS caseworker's authority to require a pre-existing voluntary living arrangement as a condition of a service plan that was voluntarily agreed to by the parent. Even though Plaintiff's children were technically not "placed" by DCFS, Defendant still believed maintaining their residence with the Samsils was in their "best interests," considering first Plaintiff's intention to remain

in a relationship with Ogle during the time criminal charges were pending against him for the alleged physical child abuse of T.M., and second, Plaintiff's inhospitable living conditions during the summer of 2005. Again, the Court must note the fact that although she felt that she did not have much of a choice, Plaintiff did agree to abide by the conditions set forth in the first two service plans. Therefore, the Court finds it was not objectively obvious, given her concerns for Plaintiff's children and the given circumstances, for Defendant to believe her actions to be unlawful. Nor was there clearly established precedent, at the time, to give Defendant notice that urging Plaintiff's mother not to allow Plaintiff unsupervised visits with her children violated Plaintiff's constitutional rights.

Plaintiff argues that the ***Dupuy*** case provided Defendant with notice that her actions were unlawful and should bar the application of qualified immunity. However, as this Court has already discussed, ***Dupuy*** shows that Defendant's actions were ultimately not, in fact, unconstitutional. Further, as Defendant notes in her brief, ***Dupuy*** was decided after the events giving rise to Plaintiff's case and therefore, could not be considered as putting Defendant on notice. Further, Defendant maintained statutory authority to seek the State's Attorney to file a petition for the adjudication of wardship of Plaintiff's children should Plaintiff not comply with the conditions of the service plans.

## IV.  CONCLUSION

As determined herein, the Court finds Professor Kennedy's opinion constitutes an inadmissible legal conclusion and therefore, **GRANTS** Defendant's Motions to Strike (Docs. 62 & 65).  Further, the Court finds Defendant's actions did not ultimately infringe upon Plaintiff's constitutional right to familial integrity. However, even such actions were to be found unconstitutional, the Court also finds Defendant is shielded from liability by the doctrine of qualified immunity. Accordingly, the Court must **GRANT** Defendant's Motion for Summary Judgment (Doc. 48) and in so doing, **DENY** Plaintiff's Motion for Summary Judgment (Doc. 56). The Clerk is directed to enter summary judgment on all of Plaintiff's claims[5] in favor of Defendant and against Plaintiff, whereby this case file will be closed.

**IT IS SO ORDERED**.

Signed this 25th day of March, 2009.


/s/        _David R Herndon_

**Chief Judge**
**United States District Court**

---

[5] Defendant also argued for summary judgment regarding Plaintiff's First Amendment claim of interference with her relationship with her mother and step-father, the Samsils, the Court also finds in favor of Defendant, as Plaintiff fails to address Defendant's arguments in either her Responding brief (Doc. 61) or her own Motion for Summary Judgment (Doc. 56).  Under **Local Rule 7.1(g)**, the Court may deem Plaintiff's failure to address as an admission on the merits.